UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Cause No. |
| Plaintiff, | ) | 1:18-cr-0097-JMS-DML |
| | ) | Indianapolis, Indiana |
| vs. | ) | **October 1, 2019** |
| | ) | 1:37 p.m. |
| THOMAS MENDHEIM (01), | ) | |
| | ) | **REDACTED** |
| Defendant. | ) | |


**Before the Honorable
JANE MAGNUS-STINSON**

OFFICIAL REPORTER'S TRANSCRIPT OF
SENTENCING


**For Plaintiff:**          Kristina M. Korobov, Esq.
                           Assistant U.S. Attorney
                           United States Attorney's Office
                           Suite 2100
                           10 West Market Street
                           Indianapolis, IN  46204


**For Defendant:**          Gwendolyn Beitz, Esq.
                           Indiana Federal
                            Community Defenders
                           111 Monument Circle, Suite 3200
                           Indianapolis, Indiana  46204




Court Reporter:          David W. Moxley, RMR, CRR, CMRS
                         United States District Court
                         46 East Ohio Street, Room 340
                         Indianapolis, Indiana  46204

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION

# I N D E X

**GOVERNMENT'S WITNESSES:**                                    **PAGE**

DEREK CRESS

Direct Examination by Ms. Korobov ...............8
Cross-examination by Ms. Beitz .................13

## I N D E X   O F   E X H I B I T S

**GOVERNMENT'S EXHIBIT:**                                      **PAGE**

1 ............................................12

1                     (In open court.)

2         THE COURT:  We're here under Cause Number

3 1:18-cr-97.  This is the case of the United States versus

4 Thomas Mendheim, who is present in person with counsel,

5 Ms. Beitz.  The government is present by Assistant United

6 States Attorney Kristina Korobov.  She is assisted by Derek

7 Cress with IMPD and Darin Odier with the FBI task force.

8 Kristine Talley prepared the Presentence Report in this case.

9 This matter is set for sentencing, and our court reporter is

10 David Moxley.

11         Prior to court today, the Court has reviewed the

12 Presentence Investigation Report.  Are there any other

13 documents for the Court to consider today, Ms. Beitz?

14         MS. BEITZ:  Your Honor, in Mr. Mendheim's

15 allocution, he will be referencing a certificate of attendance

16 to a program at Henderson County.  We do have a copy of it.

17 We did not provide it to the clerk.  If the Court wishes to

18 see it, I can --

19         THE COURT:  You can just characterize it, that's

20 fine, if you want to just tell me what it is.

21         MS. BEITZ:  It was in other documents, Your Honor.

22         THE COURT:  All right.  Thank you.

23         Anything for the government, Ms. Korobov?

24         MS. KOROBOV:  We will be asking the Court to look at

25 the complaint in this matter, which is docket 3.  And then we

1  also will have an exhibit that has some sealed photos in it

2  that I will introduce through Derek Cress.

3          THE COURT:  All right.  Ms. Beitz, have you and your

4  client read and discussed the Presentence Report?

5          MS. BEITZ:  Yes, ma'am, Your Honor.

6          THE COURT:  Is it accurate?

7          MS. BEITZ:  It is, Your Honor.

8          THE COURT:  All right.  And are there any

9  objections?

10          MS. BEITZ:  There are no objections.

11          THE COURT:  Are there any objections or corrections

12  for the government?

13          MS. KOROBOV:  No, Your Honor.

14          THE COURT:  All right.  And within the Presentence

15  Report, beginning at paragraph 96 and continuing through

16  paragraph 97, which has multiple subparts, including through

17  subpart bb), have you reviewed those proposed conditions of

18  supervised release carefully with your client, Ms. Beitz?

19          MS. BEITZ:  Yes, Your Honor.

20          THE COURT:  And do you have any objections?

21          MS. BEITZ:  No objections.  And he would waive the

22  reading of both the conditions and the justifications.

23          THE COURT:  Thank you.

24          So, Mr. Mendheim, I just asked your attorney about

25  those proposed conditions.  Do you confirm that you read those

with your attorney?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  Did she answer any questions you may have had?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  All right.  The probation officer has included the reasons why she's recommending those conditions, and I agree with her that the conditions she's proposed and the reasoning for them is appropriate in your case.  As Ms. Beitz acknowledged, you would have the right to have me read each of these conditions out loud when I pronounce sentence later this afternoon, but if you believe you understand them, you can give up, or waive, your right to have me read them.  Do you wish for me to read the conditions?

THE DEFENDANT:  No.

THE COURT:  All right.  Thank you.  The Court will accept the waiver and will further accept the Presentence Report as its findings of fact and accept the report for the record under seal.  In the event of any appeal, counsel will have access to the sealed report, but not to the recommendation portion, which shall remain confidential.

All right, if we could turn, then, to the guideline calculation that's contained in the Presentence Report, it begins on page 5, the proposed base offense level is 32. Because Minor Victim 1 was between the ages of 12 and 16,

1  but less than 16, two levels are added.  Because the offense

2  involved a computer or other interactive computer service, in

3  this case a cellular telephone, to commit the offense, two

4  levels are added.  Because the defendant was in a position of

5  trust, two levels are added.  And so the adjusted offense

6  level is 38.

7       The defendant has pled guilty, and two levels of

8  reduction are afforded to him because of his guilty plea.  And

9  then, upon motion of the government, a third level would be

10 subtracted.  Is the government making that motion?

11       MS. KOROBOV:  We are, Your Honor.

12       THE COURT:  All right.  And then that will result in

13 a total offense level of 35.  While the defendant has some

14 prior convictions, they're all of an age or type that no

15 points are assessed, so the defendant is in criminal history

16 category I.

17       At a level 35, criminal history category I, the

18 guideline range is as follows:  180 to 210 months'

19 imprisonment, five years to life supervised release, a fine of

20 40,000 to $250,000, and a special assessment of 100.  In this

21 case, because of the terms of the binding plea agreement, the

22 guidelines will be in essence overridden by the plea

23 agreement, which provides for a recommended sentence of at

24 least 240 months and lifetime supervision.  Counsel, do you

25 agree that's the correct guideline calculation, Ms. Korobov?

1          MS. KOROBOV:  Yes, Your Honor.

2          THE COURT:  And, Ms. Beitz?

3          MS. BEITZ:  Yes, Your Honor.

4          THE COURT:  All right.

5          Mr. Mendheim, you have an opportunity, if you wish,

6  to -- is the government going to call any witnesses?

7          MS. KOROBOV:  Yes, Your Honor.  The government is

8  going to call Derek Cress.

9          THE COURT:  Okay.  Do you wish for the government's

10  witnesses to go first, Ms. Beitz?

11          MS. BEITZ:  Yes, please, Your Honor.

12          THE COURT:  All right.  Go ahead.  You may call

13  Mr. Cress.

14          MS. KOROBOV:  The government would call Detective

15  Derek Cress.

16          THE COURT:  All right.

17          Sir, if you would raise your right hand for me.

18          (The witness is sworn.)

19          THE COURT:  Thank you.  Please be seated.

20          And for the court reporter, can you please state

21  your first and last names.

22          THE WITNESS:  It's Derek Cress, C-R-E-S-S.  The

23  first name is D-E-R-E-K.

24          THE COURT:  Thank you.

25          Go ahead, please.

1    **DEREK CRESS, GOVERNMENT'S WITNESS, SWORN**

2              **DIRECT EXAMINATION**

3    BY MS. KOROBOV:

4    Q.  Detective Cress, how are you employed?

5    A.  I'm a detective with the Indianapolis Metropolitan Police

6    Department.

7    Q.  How long have you been employed with the Indianapolis

8    Metropolitan Police Department?

9    A.  Twenty years.

10   Q.  Prior to the -- what's your current assignment?

11   A.  I work in the computer and digital forensics unit in ICAC,

12   Internet Crimes Against Children.

13   Q.  How long have you been so employed?

14   A.  Two years.

15   Q.  And prior to that, in what unit did you work?

16   A.  I worked between the child abuse and sex crimes unit.

17   Q.  And as part of your work, did you become involved in an

18   investigation against Thomas Mendheim?

19   A.  Yes, I did.

20   Q.  And I want to ask you some questions about the evidence

21   that was recovered in this case.  Was a search warrant

22   executed on the defendant's residence?

23   A.  Yes, that's correct.

24   Q.  And were multiple devices recovered from that residence?

25   A.  Yes, they were.

1  Q.  And on those devices, did you find images of a sexually

2  explicit nature of individuals other than Minor Victim 1?

3  A.  Yes, we did.

4  Q.  Did these include images of very young children who were

5  being penetrated and engaging in sex acts?

6  A.  Yes.

7  Q.  And did these include images that show very, very small

8  bodies compared to the size of the defendant?

9  A.  Yes, that's correct.

10 Q.  Do they also include images of -- at least one image of

11 bestiality?

12 A.  Yes.

13 Q.  Did they also include at least one image of a child in

14 bondage?

15 A.  Yes, they did.

16 Q.  And did they also include images of sex toys being used on

17 children?

18 A.  Yes, that is correct.

19 Q.  Were these found in deleted space on the defendant's thumb

20 drive in this case?

21 A.  They were, yes.

22 Q.  And did that same thumb drive also contain images of

23 Minor Victim 1?

24 A.  Yes, they did.

25 Q.  Regarding the source of these images, did some of them

1   have like, I guess, a tag on them that might say the Web site

2   that they came from?

3   A.   There was one that I do recall, yes.

4   Q.   And was that Web name Pedolita, P-E-D-O-L-I-T-A?

5   A.   Yes, it was.

6           MS. KOROBOV:  May I approach the witness?

7           THE COURT:  You may.

8   BY MS. KOROBOV:

9   Q.   I'm going to show you what's been marked as Plaintiff's

10  Government's Exhibit 1, and I'll ask you to turn to page 2 of

11  that.  Do you recognize what is contained on page 2?

12  A.   These are the images that you spoke of earlier of the

13  younger children.

14  Q.   And with respect to the images, they are not -- the images

15  that you're looking at are not sexually explicit in nature; is

16  that correct?

17  A.   That's correct.

18  Q.   These simply show the faces of the children that are

19  involved in that image; is that correct?

20  A.   That's correct.

21  Q.   And then, if you flip to page 2 of that exhibit, who is

22  shown in page 2?  Just referenced by a victim name rather than

23  a correct name.

24  A.   That is Minor Victim 1.

25  Q.   Okay.  And is this also an image that was found on the

1  defendant's devices?

2  A.   That is correct.

3  Q.   With respect to images of Minor Victim 1, were there at

4  least ten sexually explicit images found in the defendant's

5  possession?

6  A.   Yes, there was.

7  Q.   And were they created on more than one occasion?

8  A.   Multiple occasions.

9  Q.   And what in particular lets us know that about the images?

10 A.   So that has metadata attached to those images, and the

11 metadata would have dates --

12 Q.   Okay.

13 A.   -- for those images.

14 Q.   And do some of the images show, for instance, different

15 styles of her nails?  Like some have artificial nails on,

16 others do not?

17 A.   Yes, that is correct.

18 Q.   Okay.  And are there other photos that do not count as

19 federally sexually explicit images, but that, for instance,

20 show her in a state that would be state child pornography

21 under the state definition?

22 A.   Yes, that is correct.

23 Q.   And are there also multiple photos of her with her friends

24 or at her home or in school or just everyday life?

25 A.   Yes, there was.

1    MS. KOROBOV:  At this time, Your Honor, the

2  government is going to move to admit Government's Exhibit 1,

3  and I'll ask that it be kept under seal.

4         THE COURT:  Any objection, Ms. Beitz?

5         MS. BEITZ:  No objection, Your Honor.

6         THE COURT:  Exhibit 1 is admitted.  That will be

7  admitted under seal.

8                    *(Government's Exhibit 1 was*

9                    *received in evidence.)*

10         MS. KOROBOV:  May I approach the bench?

11         THE COURT:  You may.

12  BY MS. KOROBOV:

13  Q.  Detective, I want to talk briefly about the particular

14  vulnerability of this child.  We know, from the Presentence

15  Report, that Minor Victim 1 is the daughter of one of the

16  defendant's close friends; is that correct?

17  A.  Yes, it is.

18  Q.  And at the time that this investigation went on, was it

19  she who made a disclosure?  Is that how the investigation got

20  started?

21  A.  We were alerted about the investigation based on a tip

22  through NCMEC from Facebook.

23  Q.  Okay.

24  A.  After following up with Minor Victim 1, she confirmed

25  some of the information.

1    Q.  Okay.  And at the time that you interviewed her, could you

2    describe what was going on in her life at the time?

3    A.  Actually, Detective Laura Smith interviewed her at the

4    time.  However, we were coordinated at the same time, so she

5    was relaying information to me.  And at that particular time,

6    she was in a mental health crisis and actually housed in a

7    mental health facility.

8    Q.  And had the defendant been there visiting her at or about

9    the time the search warrant was executed?

10   A.  As we were attempting to serve the search warrant, it is

11   believed that's where the defendant was at at that time.

12          MS. KOROBOV:  Okay.  All right.  I believe that's

13   it.  Thank you, Your Honor.

14          THE COURT:  Cross?

15          MS. BEITZ:  Thank you, Your Honor.

16                   **CROSS EXAMINATION**

17   BY MS. BEITZ:

18   Q.  Referencing Government's Exhibit 1, page 1, you indicated

19   that those images were found in deleted space; correct?

20   A.  Yeah.  I believe they -- so the forensic units carved

21   those from the unallocated space on those devices.

22   Q.  Meaning they had been deleted?

23   A.  Correct.

24   Q.  Which takes an action on the part of the user to do that;

25   correct?

1  A.  Yes.

2  Q.  Images don't just accidentally fall into the deleted bin,

3  it takes an actual action by someone to put them in the

4  deleted space; correct?

5  A.  Based on my experience, yes.

6         MS. BEITZ:  Thank you.

7         Your Honor, I have nothing else.

8         THE COURT:  Thank you.  You may step down.

9         THE WITNESS:  Thank you.

10        (Witness excused.)

11        THE COURT:  Does the government have any additional

12  witnesses?

13        MS. KOROBOV:  No, Your Honor.  I would recognize

14  that the victim's father is present here today, and I'll

15  reference his comments in my comments -- in my argument, if I

16  might.

17        THE COURT:  Yes.

18        MS. KOROBOV:  Thank you.

19        THE COURT:  Thank you.

20        Mr. Mendheim, you have the opportunity, sir, to

21  address the Court.  And if you wish to make a statement, you

22  may do so at this time.

23        THE DEFENDANT:  Yes, ma'am.  I first want to take

24  the time to thank the Court for allowing me the opportunity to

25  speak today.  I first want to apologize to Jerry.  I want to

tell you how sorry I am for letting you down and ruining the friendship.  I never meant for any of this to happen.

I was in an extremely dark place in my life and needed a lot of help, and no place and no one to turn to.  I felt as if my entire world was crashing down around me and there was nothing I could do to stop it.  I felt as if my so-called friends had turned their backs on me because of the things I was dealing with with Kim and our divorce.  I felt ultimately alone all the time.

I tried to reach out to my church family for prayer and help, but all I could feel was severe heartache, pain, and loss.  I even felt as if my church family weren't there for me either.  I even had a one-on-one counsel with my minister.  And the one thing he told me was to try to remember that this, too, shall pass.  I tried so hard to think of that, but my heart was so broken.  I was so broken, that all I wanted to do was cry.

I lost two jobs, because I couldn't separate what was happening at home from work, plus I was so overwhelmed with being left with four children.  I felt like we had been abandoned by my now ex-wife.  I had -- I had to try to be strong for all of us, but I was so weak.  I just needed someone that I could open up to.  I just needed someone who would just listen to me.  So when XXXXXXX messaged me on Facebook, I was excited to just have a friend, not knowing

things would end the way that they did.

I want to take the time to also apologize to XXXXXXX and also thank her.  I want to apologize for my conduct first. I should have known better than to replied, indeed my deepest pain and sorrow, and I'm sorry for putting that load on you.

I am thankful to you for saving my life when so many nights -- so many nights I would contemplate taking my life. And it seemed like you just always knew when I was in trouble with my thoughts, because you would always message me at the right time.

And even for a teenager, you always knew what to say to help me when I wanted to just end my life, not even thinking -- not even thinking of how selfish I was being, not thinking of how I was going to hurt everyone in my life that loved me, especially -- I'm sorry -- especially my four beautiful children, not thinking at all that they would be the ones who would find me either overdosed or hearing a single gunshot in the late night hours, not thinking about leaving my precious babies without a father.  And now with this -- and now with this, that's exactly what I've done.

I was in such a sad and adverse state that I made a lot of bad decisions just trying to make things right with Kim.  I tried so hard to fight for my marriage, but it seemed as if the more I fought to save it, the worse things got and the deeper I sunk into depression, which I still have not

1  overcome.

2      I felt like the more we spent time, the closer we
3  became.  It was clear that our messages to each other -- that
4  our relationship was blossoming into more than what it should
5  have, and I'm sorry I allowed things to go that way.  I did
6  not know that by doing the things we were doing, I was
7  breaking any federal laws and committing crimes against the
8  United States Government.

9      I prided myself on the fact that I was no longer
10 having any troubles with the law, and that fact -- and the
11 fact that it had been 25 years since my last issue with the
12 law, and also the fact that because of that amount of time, I
13 was just starting to get jobs that were paying well enough
14 that I could start to really support my family without
15 struggling.

16     I feel as if I am back to square one now.  I feel as
17 if I've lost everything that ever mattered to me.  I've lost
18 my babies since all of this has happened.  I haven't heard
19 from them or my ex-wife in seven months.

20     I had a fifth child born while I've been
21 incarcerated, a beautiful daughter named XXXXXXXXXXXXXXX, the
22 last of my children.  I've never held her, but I've seen her
23 grow on pictures and in video visits, and she knows who I am.
24 She does call me daddy and she just lights up when I come on
25 and say, "Hey, Peanut."  She smiles so big for her dad.

1     I feel bad for all of my children, because they are
2 the ones who ultimately suffer the most in my absence.  They
3 grow up, they all grow up, without a father.  My sons grow up
4 not having any example of what a man should be, and my girls
5 grow up not having me to show them how a man should treat
6 them.  I am a good man, an amazing father.  I am a man who has
7 a huge heart for people in general.

8     And even though I was dealing with so much sadness
9 of my own, I was also trying to help XXXXXXX through her
10 depression, as well, and that's how our emotions got all
11 jumbled up, because we were dealing with so much in life, that
12 we both became confused.  We both were extremely suicidal at
13 that time in our lives, and we were just holding onto each
14 other to just stay afloat in life's oceans, just trying to
15 keep each other from drowning in the sorrow of depression.

16     People don't really understand what severe
17 depression will do to you.  It most definitely will affect
18 your judgment and decision-making.  Next to severe PTSD and
19 anxiety, it's a cocktail for disaster.  And neither one of us
20 saw this coming, but I am the adult and I should have stopped
21 it.

22     Since I've been in jail, I've had almost two years
23 to think about what led me here to this point in my life.  And
24 I do plan -- I do plan on trying to get some much needed help
25 for my depression, PTSD, and anxiety, and at the same time try

1  to recover from all the hurt I still feel, the damage my
2  ex-wife caused in my heart.  All of this happened due to a
3  severely -- all this happened due to a severely broken heart.
4  This would have never happened under any other circumstances,
5  but it did.

6         And like the saying goes, I have to own it.  So I'm
7  owning up to the very bad mistake in life -- I'm owning up to
8  a very bad mistake in life, and I feel as if I need to
9  apologize to everyone involved, not just XXXX and XXXXXXX; but
10 also to my five children; my girlfriend, Crystal, my
11 girlfriend, Crystal, who I left behind with our daughter, who
12 won't even know me until she's almost a grown woman.

13        I feel as if I need to apologize to Kim, my ex-wife,
14 for also leaving her behind to raise -- sorry -- for also
15 leaving her behind to raise our four children by herself.  I
16 know it's going to be a struggle for her and Crystal.  I feel
17 as if I need to apologize to all of my babies for leaving all
18 of you like this.  None of you deserve the heartache of having
19 a father in prison and growing up without me.

20        I feel as if I need to apologize to this Court for
21 spending taxpayer dollars to house me, feed me, clothe me, and
22 hear this case out.  Like I said earlier, this never should
23 have happened.  Since my incarceration, I have completed a
24 Bible study course, and which I still attend on Friday nights,
25 even though I've completed the course.  I've also been a

1  positive light for some others in bringing them to find

2  Christ.  I've been a member of the Church of Christ my entire

3  life, and I should have put more faith in Christ than I did.

4         I feel -- I feel as if I need to apologize to my dad

5  for -- I feel as if I need to apologize to my dad for leaving

6  him behind, also, in his failing health.  And I know he needs

7  me.  I didn't even think about him during any of this.  I was

8  only thinking of my own self, and I more than likely will

9  never see my dad again.

10         So many people have been affected by my bad choices,

11  and I do hope to try to make things right somehow.  I know

12  this amount of time is extremely harsh, but I hope to reflect

13  back on my mistakes and try to move forward for something good

14  to somehow come from this.

15         I do hope to maintain a job while I'm incarcerated.

16  I hope to receive some counseling for my depression.  I also

17  hope to obtain my GED, as well.  I do hope to find better ways

18  to deal with my depression while I'm incarcerated.  I've

19  battled depression my entire life, and I do hope to be able to

20  battle it better than I did before.

21         I'm asking that this Court -- I'm asking this Court

22  for mercy and leniency upon me.  I am a good man and not the

23  monster that people try to paint me out to be.  I was just a

24  severely heartbroken man that couldn't deal with the fact that

25  he was losing -- that he was losing the love of his life, the

woman who made him feel whole, the woman I vowed to be with until death.  Kim was my all.  And if any of you are married, you know the feeling.

Now, imagine that one day, out of the blue, it was all gone.  And the only reason was, "I don't love you anymore and we don't fit."  I took her leaving very hard, almost like she had died, but was still there for me to see, but couldn't reach.

I just hope, through all of this, I can get the help I really need to deal with all of the heartache I have endured over the last almost two years, and I hope everyone I've hurt during this ordeal, Jerry, XXXXXXX, Crystal, Kim, my children, I ask that you all can find it in your heart to forgive me for my wrongs.

And I ask that this Court will also forgive me, as well.  I once again ask that this Court, for the sake of my ailing father, my children, and the rest of my family, that you'll be merciful and lenient on me and give me the least amount of time.

I also beg, for my safety's sake, that I be sent to a soft yard at either Marion, Illinois; Milan, Michigan; or Elkton, Ohio, so I can be somewhat close to my family once again.  I ask for mercy.

And, Jerry, I'm so sorry.  I never meant for any of this to happen at all.  You guys were the -- you guys were all

1  that I had, and I ruined that.  And I'm sorry.

2        I worked on this really hard for the last four days,

3  and I thank you for hearing me.

4        THE COURT:  Thank you, sir.

5        Ms. Beitz?

6        MS. BEITZ:  I want to begin by acknowledging the

7  harm done to Minor Victim 1 and assure everyone listening,

8  the arguments that I make today are not to minimize what

9  happened to her.  I recognize the seriousness of this offense,

10 and there's nothing that any of us can do to go back in time

11 and erase that.  And I know that the Court will acknowledge

12 that in your sentence and the harm that was done.  All I'm

13 asking you today is to balance the factors you're required to

14 under law.

15       And I know that much of what I'm going to argue

16 about Mr. Mendheim can be flipped and looked at from a totally

17 different perspective, and I respect that, and I respect that

18 we're both going to be arguing hard for our clients in this

19 case, and our side.  Strategically, I understand what I'm

20 bringing to the Court can be flipped, but I'm asking you to

21 look at both sides of it and balance it out to come up with an

22 appropriate, fair, and sufficient sentence in this case.

23       What happened here, as Mr. Mendheim accurately told

24 the Court, was an extreme lapse of judgment, and it happened

25 as a result of several factors that are specific to

1  Mr. Mendheim, that the Court is aware of.  We've provided, I

2  believe, approximately 800 pages of mental health records to

3  Probation.  It was an open book.  We let them see them, we let

4  them see everything that was out there, the good and the bad.

5          And what is consistent throughout these records,

6  Your Honor, is one diagnosis over and over from the age of six

7  all the way up until his most recent testing, and that is that

8  he is clearly borderline intellectual functioning.  His first

9  IQ test had him at a 78, and later in life it was up to an 84,

10  but the Court is well aware that there's at least a five-point

11  margin of error there.  So, regardless of the numbers, it is

12  clear he qualifies with borderline intellectual functioning.

13          And what that means is, throughout his life, he has

14  relied on those around him to do the activities of daily

15  living that many of us take for granted.  His finances had

16  always been overseen by someone else.  He has a fifth grade

17  math, reading -- or fifth grade math ability.  So his finances

18  have been overseen by his parents.  And then, when he got

19  married, all of that responsibility was put on his wife.

20          And it wasn't just that responsibility.  It was the

21  responsibility of all of the things that many of us take for

22  granted, because intellectual functioning, as we know, is the

23  consequence of the interaction between individual limitations

24  and the intellectual skills and adaptive behaviors and the

25  demands and expectations of the person within the social

1  environment that they are in.

2        So growing up, his parents were extremely active.
3  You can see that in the Presentence Report.  They assisted
4  him, they took him for additional testing, they made sure that
5  he was being seen, and they were trying to figure out, "What
6  can we do to assist him?  What can we do to help him?  Because
7  he's just having trouble functioning in school, he's having
8  trouble focusing."

9        And you can see, even today, no matter how many
10  times he's tried, he's been unable to achieve a GED.  He's
11  been unable to achieve a high school diploma.  That's not
12  because he's unwilling.  It's because he has that intellectual
13  deficit that's going to follow him for the rest of his life.

14       But what's important to understand about
15  intellectual disabilities is that they are continuous but
16  they're fluid, and they are affected by the environment that
17  someone is in.  Their adaptive skills are better when they're
18  in a supportive environment, and not just the people around
19  them, but also the medication that's required to assist them
20  with things like focusing and to assist what you see
21  exhibiting as depression.

22       For Mr. Mendheim, the depression that he told the
23  Court he's feeling, it was extreme.  It was extreme to him,
24  not just because he lost the love of his life, but you have to
25  take it in context of his intellectual disability.  When his

1  wife left, she took the entire support system he had.  She

2  left him with four children, responsibility for things he was

3  not able to do, balancing a checkbook, making sure there was

4  food in the cabinets, making sure the kids' schedules were

5  taken care of, doing all of the things that he did not have

6  the ability to do.

7          When she -- they got married, he -- his adaptive

8  functioning allowed him to do exactly what she required of

9  him, but she took care of the rest.  And when she left, he was

10  left holding all of these responsibilities he was just unable

11  to do.

12          And as he told you, he became overwhelmed, he was

13  extremely depressed, and he was looking for a friend.  And he

14  looked for a friend in an extremely inappropriate place.  And

15  he found that friend in Minor Victim 1, and that quickly

16  blossomed into something it should not have.  It should never

17  have gotten to that point, he recognizes that.

18          He recognizes today that at the time that they

19  became close, she was also struggling, Your Honor.  She was

20  also struggling, and he recognizes that putting all of this on

21  her was inappropriate, should never have happened, and, quite

22  frankly, made her worse.  He recognized that because of all

23  the factors in his life, his judgment wasn't there to stop

24  him.

25          So I know the question in front of the Court is, so

1  what do we do?  What do we do with somebody with intellectual

2  disabilities?  Because I know the Court has to balance who he

3  is, why he did this, how this happened, with the protection of

4  society.  And that has to be something that's weighing very

5  heavily on the Court's mind.

6         And as I explained about ID, it is fluid, it's

7  continuous and changing, depending on the person's functional

8  limits and the supports available within their environment.

9  We have agreed, through a very carefully crafted plea

10 agreement, Your Honor, to lifetime supervision.  That is going

11 to provide him with the structure, the accountability, and

12 someone to keep him on track in all of the areas to make sure

13 that he is not stepping out.  And I know that, because of the

14 paperwork we provided to Probation, that they're going to be

15 well aware of his deficits when they do start supervising him.

16        And as the Court mentioned, his conditions of

17 release went on and on.  We agreed to those because we

18 recognize it's necessary.  It's going to be necessary for him

19 to follow through, to know where his boundaries are, to know

20 where his limits are, and to give him clear instructions as to

21 what he needs to do.  So we've agreed to lifetime supervision.

22        And despite where the guidelines came out in this

23 case, because they came out well below what we agreed as the

24 floor on punishment here, we recognize the seriousness of it

25 and we've agreed to that.  But we do believe that 20 years is

1  sufficient.  Two decades is sufficient in this case.

2           When he goes to the BOP, he is going to be in that

3  structure, he is going to have, hopefully, a counselor who

4  understands where he's at, but we ask that his BOP time start

5  at a medical facility.  He clearly is suffering from continued

6  mental health issues.  He is depressed, as he told you.  And

7  because of his intellectual deficits, it's hitting him a lot

8  harder than it would the rest of us.  And he's doing his best

9  to try to adapt through that, but he needs proper medication

10  and he needs to be on monitoring until they can get him on

11  something that stabilizes him.  So we ask the Court recommend,

12  at least initially, that he go to a medical center.

13           Twenty years is also important because of where he

14  will be placed.  The Court is well aware that a sentence that

15  includes over 20 years, or 20 years and up, he does not

16  qualify to go to a low.  Mr. Mendheim, with his specific

17  characteristics, needs to go to a low facility.  He needs to

18  be able to be somewhere where his safety isn't going to be an

19  issue, he's less likely to be taken advantage of because of

20  his intellectual deficits, and he's not going to be in a place

21  where his paranoia will take over.  And that's another thing

22  that the Court saw reported to you from the records we

23  provided to Probation.  That's something he's also struggled

24  with because of his intellectual deficits.

25           Twenty years is enough time for him to get the

1  rehabilitative training he needs, it's going to allow him to

2  do the in-house residential treatment program for sex

3  offenders.  And what's important about that is that it

4  combines cognitive behavioral emphasis with in-house

5  therapeutic community treatment, and it's been proven

6  effective in reducing inmate recidivism.  He is somebody who

7  absolutely qualifies for this.  And even with his intellectual

8  deficits, he should be able to participate in this.

9          I'm going to ask that the judgment reflect his

10  intellectual deficits, because the first thing that's going to

11  happen when he gets to the BOP, Your Honor, before they let

12  him do anything else, is they're going to ask him to complete

13  a GED.  The Court knows that.  That is the ticket that gets

14  you into all programming.  But it needs to be recognized

15  somewhere within the judgment that that may not be possible

16  for him.  He may not be somebody able to get -- obtain his

17  GED, no matter how hard he tries.  And so we ask that

18  treatment be given even if he's unable to complete his GED.

19          Considering the harm that has happened here, we

20  conceded to a sentence above the guidelines.  Ms. Korobov and

21  I carefully crafted this.  This is the result of a great deal

22  of back and forth, looking at the evidence, talking about the

23  harm, and coming to this agreement that Mr. Mendheim agreed

24  to, as well.  He agreed to a floor of an above-guideline

25  sentence.  He also recognized the harm that he did.

1       But 20 years is enough in this case.  The harm was

2  great.  Two decades atones for it, and we ask that that be the

3  appropriate sentence in this case, with the Court's

4  recommendation for sex offender treatment; residential; mental

5  health counseling; placement at a medical facility, at least

6  initially, for evaluation; and then followed by placement at

7  either Milan, Michigan; Elkton, Ohio; or Marion, Indiana --

8  I'm sorry, Marion, Illinois.  This will allow him, hopefully,

9  to have visits with family.  He has a lot of work to do to

10 repair those relationships, and he wants to do that.  He

11 wishes to move forward with that.  Placement there would allow

12 him at least the opportunity to do so.

13      Again, the harm to Minor Victim 1 was great.  No

14 one, regardless of what sentence you give him today, is going

15 to walk out of this courtroom feeling like we won, whether you

16 agree with my sentence or agree with Ms. Korobov's

17 recommendation.  No one is going to feel like they won,

18 because this case, as many of these cases have, have left

19 nothing but devastation.

20      As you heard, he's lost his children.  He's never

21 even met, held, kissed one of his children at this point.  He

22 is suffering the consequences of what he has done, and he's

23 going to continue to suffer the consequences.  We just ask

24 that that include 20 years and the recommendations that we

25 asked for, as well as, and most importantly, lifetime

1  supervision.

2          THE COURT:  Thank you.

3          I thought of a question for Mr. Cress probably after

4  his -- well, after his testimony, or I would have asked him

5  sooner, so I'm going to ask him now, and if you want to

6  comment any further.

7          The dates of the photos -- can you tell, from the

8  photos that are listed in Exhibit 1, when those photos were

9  downloaded or uploaded?

10          MR. CRESS:  I don't believe that there's actually

11  dates with those photos.

12          THE COURT:  Okay.

13          MR. CRESS:  If you -- if I could check, Judge, for

14  just a second.

15          (Off the record.)

16          MR. CRESS:  I do have dates for last accessed --

17          THE COURT:  Okay.

18          MR. CRESS:  -- which would have been April 24th of

19  2017.  That includes the photos that you're speaking of,

20  Judge.

21          THE COURT:  All right.  Thank you.

22          Ms. Korobov?

23          MS. KOROBOV:  Thank you, Your Honor.  In this

24  courtroom, it is not the case that has left nothing but

25  devastation.  It is the defendant who has left nothing but

1  devastation by his actions.  It is not -- it is not accurate

2  to refer to the relationship as one that blossomed into

3  something inappropriate, because this blossomed like a

4  mushroom cloud.  And Ms. Beitz is correct, it leaves nothing

5  but devastation in its wake.

6          It is not the case, though; it is not federal law;

7  it is not this child being suicidal; it is not the defendant's

8  absence of other people to turn to.  It was his desire to turn

9  this child into something sexual to make himself feel better,

10  because he could have had her companionship all by itself

11  without turning her into a sex object.  And that's what he

12  did.  And then he wants to say it's to make himself feel

13  better or to satisfy sexual desires that have perhaps existed

14  longer than we know.  We're not going to know.

15          In this case, as I said, Minor Victim 1's father is

16  here, and I offered him the opportunity to speak.  I want the

17  Court to know that he has been at every single proceeding in

18  this case and has oftentimes brought friends for support with

19  him.  Those people were the defendant's friends, too.  And

20  what they have --

21          THE COURT:  How do they know each other?

22          MS. KOROBOV:  They're in a car club together, Your

23  Honor, and they've been friends for a period of time.  I

24  believe the defendant said it was a matter of months, but this

25  was a longer period, according to the victim's father, than

1  that.

2         The victim referred to him as an uncle.  The father

3  said, "I wish I could tell you what you did to my child.  You

4  ruined her life.  You took my family.  She's not even there

5  anymore.  She's gone.  You took my family."  And this from a

6  man who was doing everything he could to do right by his

7  daughter, to take care of her, to surround her with people who

8  he believed cared about her and would be good for her.

9         One of the things that I think is the most betraying

10 for Minor Victim 1's father is that he didn't know about the

11 defendant's prior sex offense conviction.  He said, "Had I

12 known that, I never would have let this man around my child."

13 And that should have been a warning flag for the defendant,

14 too, because while his age was 19 and that child victim's age

15 was 12, he knew that sex with people underage is illegal.  So

16 whether he knew that it was federally illegal or state side

17 illegal or just morally disgusting, it's impossible to believe

18 that he didn't know that.

19        You think about the age of his own children.  And if

20 a man of his age would have approached his 11-year-old

21 daughter, what would he have thought about that?  And in this

22 case, it becomes even more aggravating because, as he

23 reflected in the PSR, the -- his children were friends with

24 Minor Victim 1.  So this wasn't just a contact that he had

25 with her, or even with her father.  His family and her family

1  were, in a sense, a support for each other, and he cost the

2  child that, too, and he cost his own children that.

3      And when the defendant makes comments like, "Well,

4  neither one of us saw this coming," or, "this never would have

5  happened but for a broken heart," I don't think he fully

6  appreciates the whys of it, and maybe he never will.  But it

7  wasn't the child's responsibility to see this coming.  It was

8  his responsibility to never, ever go there.

9      I want to direct the Court's attention in particular

10  to the criminal complaint that was filed in this case, and to

11  pages 7 through about 10.  And in this complaint, starting at

12  page 26, it --

13      THE COURT:  You said page 26?

14      MS. KOROBOV:  Paragraph 26.

15      THE COURT:  Sorry.  Okay.

16      MS. KOROBOV:  It details some of the defendant's

17  conversations with Minor Victim 1 that were captured by

18  Facebook, and they are beyond disturbing.  There's no talk in

19  here of, "Baby, I want to support you.  How can I help you?

20  Don't be suicidal."  It's his desire -- he's asking her

21  whether she's horny, if she's ready for him.  And when she

22  says, "I'm too pissed, I'm too depressed, I just want to

23  smile, I've had enough people piss me off talking about sex.

24  Please don't be the next."

25      If you flip over, here he is, "Okay.  Well, I

1  figured you were ready."  And I'm not even going to repeat the

2  language in here because of the presence of the child's

3  father, but when she says, "I'm probably going to cry," "Well,

4  don't cry.  If you want to cry," and he gives a solution

5  there.  And that's on page 11 of that document.  She tells him

6  he loves her (sic) and he again references sex.

7        Then in the days after that conversation, where he

8  has now transported her out of state, he has had sexual

9  contact with her, she then tells him that she's sore, that she

10 is, in fact, bleeding, and she can't tell what's going on.

11 She says, "I should probably go to the hospital."  And his

12 response is that, "Well, let's give it a day or two if you're

13 going to go to the hospital."  Because, see, now she's told

14 him that she's late for her period, and someone has a problem

15 on his hands.

16        So, instead of tending to this child's medical

17 needs, and instead of making sure that she is taken care of in

18 the same way that he claims she took care of him, he wants to

19 make sure that no one finds out.  And in fact, if the Court

20 looks at the last line of page 13 -- page 11 of the complaint,

21 he tells her, "Delete all."  That's what he's concerned about.

22 This child is having unexplained bleeding, and he wants to

23 make sure he doesn't get caught.

24        So when he says to you, "Gees, I was just so caught

25 up, I didn't even know this was illegal," oh, yes, he did.  He

1  most certainly knew it was illegal.  And for whatever

2  intellectual deficits he has, and I don't question those at

3  all; for whatever emotional pain he was in, I don't question

4  that at all; he's still thinking about criminal consequences

5  and getting caught.  And, in fact, he tells her to text -- she

6  says, "Text my phone about this."  They both know that this is

7  going to be a problem, and yet it was never her

8  responsibility.

9          I would ask the Court, when it comes to looking at

10  the number, the government is asking for 25 years of

11  incarceration, and here's why.  Ms. Beitz and I did talk about

12  the different sentencing options in this case.  And when you

13  look at the -- kind of the cross-reference in this case is to

14  production, right, because that's what the defendant did.  He

15  used a child to create sexually explicit images of a child.

16          But from the very beginning, Minor Victim 1's

17  father has been clear, she cannot testify.  And we have worked

18  to resolve this case with that goal in mind, that she would

19  not have to testify.  That's why we came and made this offer

20  in this case.  To get her to explain that, "I created these

21  images specifically for him," that, "He used me to create

22  these images," would have required her testimony in court.

23          But, because of the defendant's prior sex offense

24  conviction, the penalty for that offense -- which he admits in

25  the cross-reference is 25 to 50 years.  So, already the

1 government has made some concessions in coming to the 20-year

2 number, just like the defendant has made concessions in coming

3 up to the 20 years.  It is not magnanimity on the defendant's

4 part.  It was a meeting that we agreed that this is our

5 starting point, 20 years.

6          I would indicate, though, that when we

7 cross-referenced to the production guideline, what that meant

8 is that there's no way to account for pattern of behavior in

9 here.  You see, if the defendant had pled to coercion or

10 enticement or to production, which, again, he has admitted to

11 doing in the cross-reference, then he would have received five

12 additional levels for pattern of sexual behavior, because this

13 conduct occurred on more than one occasion.  And it wasn't

14 just the receipt of the images, it wasn't just the production

15 of the images; it was actual sexual conduct with her, which

16 was illegal under Indiana law.

17          There's no accounting for the other possession of

18 child pornography in here.  And the fact that the defendant

19 had sexually explicit images of other children -- and not just

20 other children, but when the Court looks at the faces of those

21 children, they are littles.  This isn't a man who's just

22 sexually attracted to a teenager.  To look at that material,

23 bestiality, bondage, those little children being penetrated,

24 there is something much more disturbing here than, "I was

25 lonely and she texted me when I was lonely."  And there's no

accounting in the guidelines anywhere for the bestiality and
S&M material, or the infant/toddler, which would have added
four additional levels to the defendant's sentence.

So whether he pled to receipt at 15 to 40 and we had
not cross-referenced production, or whether he pled to
production and you had the five-level enhancement, the
guidelines would have been higher. There are just some
factors that fell out here because of the nature of the
offense. And it's a plea that, as Ms. Beitz referenced, was
done in concession for the defendant accepting responsibility
and also to prevent Minor Victim 1 from having to testify.
But those are facts that the Court must consider.

When the Court looks at the circumstances of the
offense, another factor that I'd ask the Court to consider is,
in the complaint the defendant references that he didn't
ejaculate inside the victim, but if the Court notes, he didn't
reference, "You are on the pill or I wear a condom." He could
have turned a 15-year-old girl into a mother. And would he
have thought that would make her life better? The
circumstances are awful.

Encouraging her not to get medical care when she
needed it, having sex with a child, and the fact that this was
kept so quiet, and that pressure, that subtle pressure on her,
"Delete this," always making sure that she knew that that
responsibility was hers, to stay quiet about this so that she

could still have the attention, affection, and appreciation that the defendant doled out, but always with a sexual component.  When the Court looks at that conversation with the child, it's very clear that it is not about building her up or trying to prevent her from taking her own life.  It's about satisfying his own sexual needs.

I'd also ask the Court to consider the fact that when the defendant committed this offense, he was his children's support.  What their mother did in deserting them is awful, but here's a man who suddenly has four children that he's got to take care of every day, and I don't doubt that that was overwhelming.  And guess what.  It happens to women every day in this country.  It happens to other men every day in this country, that a partner just walks out and leaves you high and dry.

It is not a natural consequence of that, that you then turn to a child and you sexually abuse them, even if you are intellectually limited.  Even if you have mental health issues, being left or being deserted doesn't turn you on to children, including children of the very young ages that we saw in that sexually explicit material.  The defendant created a hardship on his own children by what he did.

I'd also note the fact that the defendant had a girlfriend at the time of the offense, and he had created another child with her.  So let's be clear, that at the time

that he is sexually abusing Minor Victim 1, he's also having
unprotected sex with another woman.  So now he's orphaned not
four children, but five, and for the most selfish of reasons.
It's simply about that, and that is quite frankly what the
government comes back to over and over again.

This isn't a crime involving fraud, where perhaps
the defendant got caught up in something that he didn't
understand.  It is not a crime that required intellect to
understand that the behavior was wrong.  This is a man who had
already gotten a warning that children are off limits, and he
did it anyway.

He's already received counseling, too.  He has
received counseling throughout his life for what it is that
brings him to this point.  And I understand and I respect that
depression, particularly clinical depression, as opposed to
perhaps something just situational.  So not only did he have
the extreme circumstances of his situation, but he's also had
long-standing issues with depression.  He's had treatment for
that, though, and none of that stopped him from committing
these offenses.

So for the Court to simply hope that after 20 years
of imprisonment, that things are suddenly going to be better
for him if he has the strong structure of probation, he had
those, I guess, resources in the past available to him.  He
had an adult girlfriend who he could have turned to for help,

1  but he didn't do that.

2          Instead, he turned his back on someone who showed

3  him nothing but love.  He turned his back on a whole family

4  who had been there for him as a system of support, and he

5  sexually abused their child.  And in so doing, what he took

6  from her is substantial.  And for that reason, we would ask

7  for a sentence of 25 years of incarceration and, as we've

8  agreed, a sentence of lifetime of supervised release.  Thank

9  you.

10          THE COURT:  Thank you.

11          All right.  So the Court is required to consider all

12  of the factors listed in 18 United States Code, Section

13  3553(a), and the first are the nature and circumstances of the

14  offense.  And the Court notes that within the definition of

15  the offense, the Court can consider the other relevant

16  conduct, particularly that which was highlighted by the

17  government, but I want to focus on the offense itself and the

18  nature of the relationship of the defendant and this child.

19          There are some contradictions, I guess, or

20  inconsistencies with the notion of loneliness and being

21  unsupported, Mr. Mendheim, when you look at the timing of the

22  relationship between you and your youngest child's mother.  So

23  that's of concern.  And the fact that you had this

24  relationship with this child while her father was still your

25  very good friend indicates to me that you have a support

1 system.

2          And, fundamentally, I felt as though your statement

3 to the Court indicated a lack of understanding about why this

4 happened, and it tended to project it on other people.  And I

5 think that when we look at the conversation that's outlined in

6 the complaint that's part of the record in this case, as the

7 government noted, your dealings with Minor Victim 1 in that

8 conversation were not emotionally supportive.  They were

9 sneaky and sexual in nature.  And as the government noted,

10 it's also particularly troubling to the Court that when the

11 child was advising you of potential health issues she was

12 having, your response was to tell her to hold off and then

13 finally to, "Delete all."

14          So the fact of the presence of other pornography on

15 your phone is of concern to the Court, and is also child

16 pornography, I should make clear; and the ages of the children

17 that are included in that particular exhibit, as well as the

18 Web site that it came from, is of concern to the Court in

19 terms of your attraction to -- sexual attraction to children.

20          And as the victim's father said, she's just gone,

21 and she's gone because you didn't support her emotionally, you

22 didn't look out for her best interests.  You looked out for

23 your own interests, whatever those were.  I don't dispute that

24 you were coming from a place of hurt, but you knew better, and

25 you sure should have known better.

1        Your history and characteristics.  This is your

2   second offense of a sexual nature that involved a child, and

3   the Court notes that.  You also had sort of repeated

4   involvement in the justice system, even though -- the criminal

5   justice system, even though you didn't get points for it in

6   the criminal history category.  And so, as far as that goes,

7   your criminal history, I'll just leave it where it is in terms

8   of the guidelines.

9        But the concern that I have, that -- you were

10  forthcoming with Probation in terms of sharing information

11  about your past, but my concern about your situation and your

12  judgment is that it wasn't necessarily borne of an emotional

13  situation, but rather it evolves from, I think, a

14  self-centered behavioral style that causes you to justify what

15  you do when you're hurting.  That's my concern.

16       And while your lawyer said that your intellectual

17  disabilities and your responses to them and the other mental

18  health issues that you have are fluid and changing, that makes

19  them unpredictable and of concern to the Court in terms of

20  your ability to regulate your own behavior in the future.

21       Sexual abuse of an adolescent girl can be a

22  life-altering situation.  With significant counseling, some

23  amends can be made, some repair to the damage that you've

24  inflicted, but it is particularly serious.  And it undermines,

25  as much as anything, her sense of trust and will prevent her,

1  at least until she gets some significant treatment, from being
2  able to have the kind of trust that a little girl who didn't
3  undergo what she went through has.

4          I mentioned before your criminal history.  One of
5  the purposes of sentencing is to promote respect for the law,
6  and that was another point the government made, that I want to
7  address, as well.  You seem to have some line in your mind
8  about whether something was a federal violation or maybe
9  thinking it was okay if it was just a state.  I'm not really
10 sure what you meant by that statement, but there could be no
11 confusion that you were committing a crime when you had sex
12 with this child.

13         I need to make sure there's adequate deterrence, but
14 of most concern to me is the protection of the public, and
15 specifically the most vulnerable public that we have, which is
16 minor children.  So I also note that, as the government
17 pointed out, there were certain aggravating factors that
18 aren't included in the guidelines because of how this plea
19 deal was struck and what charges were included, but there's
20 apparently no disputing the fact that some of the images that
21 were found on the phone involved very sick conduct towards
22 tiny children, and that is of grave concern to the Court.

23         So I think that in asking for a sentence of 25
24 years, the government has actually been appropriately, I will
25 say, measured in terms of the request that it's making.

1 Twenty years is a long time, but given my concern that your

2 ability to regulate your behavior has not been proven to be

3 true, looking at your past behavior, I think a sentence of 25

4 years is a fair sentence in this case.  It will allow Minor

5 Victim 1 to attain a pretty mature age while she won't have

6 to worry about you being accessible to her as time goes by.

7 I will, of course, recommend all of the treatment

8 that your lawyer recommended, and I do think you need serious

9 mental health treatment.  But, I think, balancing all of the

10 factors that would be mitigating for you, the aggravating

11 factors of the damage to this child and the need to let her be

12 safe for a period of time outweigh the other factors, so I'll

13 go ahead and state the proposed sentence at this time.

14 Pursuant to the Sentencing Reform Act of 1984, it's

15 the judgment of the Court that the defendant, Thomas Mendheim,

16 is hereby committed to the custody of the Bureau of Prisons,

17 to be imprisoned for a term of 240 months.  The Court

18 recognizes this is an upward variance, but the Court believes

19 it is justified, the reasons for it in the sentencing

20 statement.  The Court finds the sentence is sufficient, but

21 not greater than necessary, to provide deterrence, promote

22 respect for the law, and, most importantly, to protect the

23 public, especially minor children, from further crimes of the

24 defendant.

25 MS. KOROBOV:  Excuse me, Your Honor.  The Court just

1  said "240 months."

2          THE COURT:  I meant 300 months.  I apologize.

3          MS. KOROBOV:  Thank you.

4          THE COURT:  The Court recommends an initial

5  placement at a medical facility for a mental health evaluation

6  and to develop a treatment plan.  The Court recommends

7  residential sex offender treatment programming.  The Court

8  recommends continuing education, though notes that a GED may

9  well be unlikely due to the defendant's intellectual

10  disability.

11          I hope that addresses what you had asked me to deal

12  with, Ms. Beitz.  I don't know where else to put it in the

13  judgment.

14          The Court recommends -- once Defendant's treatment

15  plan is established, the Court recommends placement in Milan,

16  Michigan; Elkton, Ohio; or Marion, Illinois.

17          Is any restitution being requested?

18          MS. KOROBOV:  No, Your Honor.

19          THE COURT:  All right.  The defendant shall forfeit

20  the Samsung cellular phone.  The Court is not imposing a fine.

21  Supervised release is required by statute, and in accordance

22  with the plea agreement, the Court is imposing a lifetime term

23  upon release from imprisonment and is incorporating into the

24  judgment those conditions of supervision that are included in

25  paragraphs 96 and 97 of the Presentence Investigation Report.

1    The Court is also ordering the mandatory special

2    assessment of $100, as well as a $5,000 assessment for the

3    Justice for Victims of Trafficking Act.  Payment of the fine

4    and special assessments are due immediately and are to be made

5    directly to the Clerk of the United States District Court.

6         MS. BEITZ:  Your Honor?

7         THE COURT:  Yes.

8         MS. BEITZ:  He is indigent.  The Court has found him

9    to be indigent when they appointed me.  With regard to that

10   additional $5,000 fine, we would argue it's not appropriate,

11   because the Court has already determined he's indigent.

12        THE COURT:  Do I have any choice to go down from it?

13        MS. KOROBOV:  I think, as I understand it, it is a

14   flat JVTA assessment of 5,000 if not indigent.  The Court

15   could, I suppose, impose a fine and direct it a certain place,

16   but that's -- I don't think it's -- I think it's either a yes

17   or no.

18        THE COURT:  Okay.  Given that point, the Court will

19   impose -- will vacate that portion of the judgment, as I

20   stated, and impose a $1,000 fine.  He'll be working for 25

21   years and he'll be able to pay off a $1,000 fine.  I don't

22   think I can direct it beyond that.

23        Counsel, do you have any legal objection to the

24   sentence I have proposed or do you require any further

25   elaboration of my reasons under Section 3553(a), either as to

1  the length of imprisonment or the length and/or conditions of

2  supervised release?  Ms. Korobov?

3          MS. KOROBOV:  No, Your Honor.

4          THE COURT:  Ms. Beitz?

5          MS. BEITZ:  Your Honor, I -- just to clarify, one

6  point, and I do not believe this will matter to the Court's

7  decision, but the images in Exhibit 1 were not from the cell

8  phone.  They were found on a thumb drive in a deleted space.

9          THE COURT:  Okay.

10          MS. BEITZ:  I understand that may not, but the Court

11  referenced the cell phone several times with regard to that.

12  I wanted to make sure the Court --

13          THE COURT:  I apologize.  You're right.  And the

14  Court will correct the record to note that the images were

15  found on the thumb drive.  And --

16          MS. KOROBOV:  And, Your Honor I'm -- I apologize.

17  If I -- I don't know if there's an objection from the defense

18  to destroying the thumb drive, as well, to ordering that to be

19  forfeited for the purposes of destruction.

20          THE COURT:  That's why I was going to with the

21  phone.  Sorry.

22          MS. BEITZ:  We agree to that, Your Honor.

23          THE COURT:  All right.  So the Court will also order

24  the thumb drive to be forfeited.

25          Do you have any further recommendations, Ms. Beitz,

1  or requests for any further recommendations from the Court?

2             MS. BEITZ:  No, Your Honor.  Thank you.

3             THE COURT:  The Court will order the sentence

4  imposed as stated, then.

5             Mr. Mendheim, you can appeal your conviction if you

6  believe that your guilty plea was somehow unlawful or

7  involuntary or if there's some other fundamental problem in

8  the proceedings that was not waived by your guilty plea; do

9  you understand?

10            THE DEFENDANT:  Yes, ma'am.

11            THE COURT:  Generally, you would also have the right

12 to appeal your sentence.  However, your plea agreement

13 contained an appellate waiver.  And unless the Court is

14 mistaken, that waiver is in effect.

15            Does the government agree?

16            MS. KOROBOV:  Yes, Your Honor.

17            THE COURT:  Does the defendant agree?

18            MS. BEITZ:  Yes, Your Honor.

19            THE COURT:  All right.

20            But you may appeal your sentence if you believe that

21 your sentence is contrary to law; do you understand?

22            THE DEFENDANT:  Yes, ma'am.

23            THE COURT:  To begin an appeal, you must file a

24 notice of appeal within 14 days of the entry of judgment.  If

25 you cannot afford the filing fee or cannot afford to pay a

1 lawyer to appeal for you, the Court will appoint a lawyer to

2 represent you on appeal; do you understand?

3             THE DEFENDANT:  Yes, ma'am.

4             THE COURT:  Also, upon request, the clerk of court

5 can prepare and file a notice of appeal.  Do you have any

6 questions about your appellate rights or the time limit for

7 filing a notice of appeal?

8             THE DEFENDANT:  No, ma'am.

9             THE COURT:  All right.  The Court will order the

10 defendant remanded to the custody of the United States

11 Marshal.

12             Anything further for the government, Ms. Korobov?

13             MS. KOROBOV:  No.  The government moves to dismiss

14 Counts 1 and 2.

15             THE COURT:  Any objection, Ms. Beitz?

16             MS. BEITZ:  No, Your Honor.

17             THE COURT:  Counts 1 and 2 will be dismissed.

18             THE COURTROOM DEPUTY:  All rise.

19             (Proceedings adjourned at 2:48 p.m.)

20

21

22

23

24

25

1          CERTIFICATE OF COURT REPORTER

2

3

4        I, David W. Moxley, hereby certify that the

5    foregoing is a true and correct copy of the

6    transcript originally filed with the clerk of court

7    on August 7, 2018, and incorporating redactions of

8    personal identifiers requested by the following

9    attorneys of record: Kristina Korobov, in accordance

10   with Judicial Conference.  Redacted characters

11   appear as X's in the transcript.

12

13

14

15   /S/ David W. Moxley                September 15, 2020

16   DAVID W. MOXLEY, RMR/CRR/CMRS
     Official Court Reporter
17   Southern District of Indiana
     Indianapolis Division
18

19

20

21

22

23

24

25